[No. 195.   Decided August 1, 1891.]
## HIRAM N. MUZZY v. LUCY A. TOMPKINSON.

EQUITY PLEADING — CANCELLATION OF DEED — WANT OF CONSIDER-
ATION — MEASURE OF DAMAGES.

   In an action by a daughter to set aside a deed executed to her
father on the ground of want of consideration and false representa-
tions as to the nature of the conveyance, the complaint showed the
relation of the parties and the defective mental and business char-
acter of the plaintiff; that the father, while the relation of trust and
confidence existed between him and his daughter, and with knowl-
edge of plaintiff's inexperience, procured her to sign a certain writ-
ing without paying any consideration therefor; that this writing
was a deed to defendant, and that he represented it to be a mort-
gage.   *Held,* That the *gravamen* of the action depends as much
upon the allegation of want of consideration as upon that of fraud-
ulent representation, and that proof of want of consideration will
entitle plaintiff to relief although she may fail to sustain the allega-
tions of fraudulent representation.

   In such an action, judgment for plaintiff is justified, when the
evidence shows that a mortgage and certain deeds were executed
by plaintiff by the direction of the defendant; that she did not know
the purport and effect of the same; that the same were executed
without any consideration moving to her; that no attempt was
made by any one to explain to her the purport and effect of said

instruments; that she was of defective mental capacity and inexperienced in business; and that she was living with her father, wholly under his influence, and accustomed to rely implicitly on his advice and obey his instructions.

In such an action, where defendant has, in good faith, conveyed away a portion of the land fraudulently acquired, without any purpose to place it beyond the reach of plaintiff, the proper measure of damages for the land thus disposed of is its value at the time of its conveyance.

The supreme court will not render judgment against the sureties on an appeal bond, under Code 1891, § 1432, where the bond secures to appellee the payment of all rents or damages to property during the pendency of the appeal, unless such damages can be known without an issue and trial. (Opinion on rehearing.)

*Appeal from Superior Court, Spokane County.*

The facts are fully stated in the opinion.

*Turner & Graves,* and *G. G. Ames,* for appellant.

*Nash & Wakefield,* for appellee.

The opinion of the court was delivered by

Stiles, J.—The parties to this action were father and daughter. The appellant, Muzzy, about 1880, settled himself and family on government land on the opposite side of Spokane river from the then village of Spokane Falls. His family consisted of himself, his invalid wife, and five children, all of whom were of mature years. His other children had from time to time either married or left home for the purpose of maintaining themselves. The respondent was then about twenty-five years of age, and a single woman. In intelligence she was rather below the average, and had had slight advantages of education, and little or no business experience. It was contended in her behalf at the trial of the cause that she was mentally incompetent, but we think, upon the whole, that it fairly appears from the record that there was no unusual weakness of intellect, but that lack of education was about all

that would characterize her as different from ordinary
women in her position in life. Her family were then poor
and she had been accustomed to doing the housework of the
family. A somewhat unusual corpulency and shyness re-
sulting therefrom seem to have rendered it probable that
she would never marry. It is clear that for her entire
support she then relied, and always expected to rely, upon
her father. In return therefor she was content to remain
at home, nursing her sick mother, and doing the house-
hold work, leaving all-matters of business wherein she had
any interest to be attended to by her father.

The appellant, soon after arriving in Washington, con-
ceived great confidence in the future of Spokane Falls, and
proceeded to acquire a body of land in that neighborhood,
by exercising his homestead rights. He also caused the
respondent to locate herself as a homesteader upon the land
in question, in the fall of 1882. Her sister also located
upon an adjoining quarter section. It is agreed by all
parties that the lands entered upon consisted of a gravelly
plain that was of practically little or no value for any pur-
pose excepting as it might depend upon the future develop-
ment of the village near the falls. The nature of the
soil rendered it totally unfit for cultivation. The appel-
lant chose to acquire his own tract by residence thereon
during the full term of five years; but in the spring of
1883, after having built for his daughter a fence around
her tract, and a small house in which she kept up the neces-
sary residence for about six months, he advised her to com-
mute her homestead to a cash entry, and by so doing avoid
the further necessity of living on the land. She had no
means whatever with which to pay either the office fees,
the cost of the improvements made upon her tract, or the
sum of $400, which was the government price for the land.
She stated, without contradiction, that in consideration of
the improvements her father was to have the "back forty,"

and when the question of means with which to pay for her land came up her father suggested that she mortgage the place to secure it. At the same time her father was in need of money, and they joined in making a note to one Ollis for the sum of $1,500, which was secured by her giving a mortgage to Ollis for that amount on her tract. The money being thus procured, $400 of it was used to pay the government, and the remainder of it went to appellant's use. This mortgage was made by respondent against the advice of at least one of her brothers, who maintained that she should not thus burden her land for the sake of assisting her father, and that she ought to procure only the actual sum which she needed. She desired, however, to assist her father, and relied entirely upon his promise to see that the loan was repaid and the mortgage canceled. She made her final proof in December, 1883, and in May, 1884, obtained her patent. This mortgage was satisfied on the 22d day of May, 1886, and on the 24th day of the same month, at the suggestion of her father, she executed another mortgage to one Jennison on the same land, for the sum of $1,200, the note being signed by herself and her father. On the 8th day of March, 1886, at the instance of her father, she executed a deed to one Turner, by which she conveyed forty acres of her tract in consideration of $1,500. And on the 14th day of June following, also at her father's suggestion, she executed a deed to one Abernethy for another forty acres of her land, for a like consideration of $1,500. These two sums of $1,500 were paid to her father in money by her grantees, and the amounts were retained by him. On the 15th day of June, 1886, for the expressed consideration of $1,000, she executed a deed to her father for the remaining eighty acres of her land. This $1,000 was not paid to her then, or at any other time, nor did she ever receive any portion of the $3,000 derived from Turner and Abernethy. From the time of the execution of the last-

named deed until this action was commenced on the 16th day of December, 1889, the appellant has, therefore, been the legal owner of the eighty acres conveyed to him, with the exception that on the 10th day of September, 1887, he conveyed to the Spokane College a tract of about fifteen acres, for which he received no substantial consideration, the conveyance being in the nature of a donation to that institution. The respondent now brings her suit to set aside the deed executed by her to her father for the eighty acres, with the exception of that portion of it conveyed to the Spokane College, and prays judgment against him for the $3,000 paid by Turner and Abernethy, and for the value of the fifteen acres and upwards conveyed to the college.

The complaint set forth that up to the 15th day of June, 1886, since her patent, respondent was the owner of the tract. She alleged the relationship between herself and her father; that she was at all times since 1882 ignorant and wholly inexperienced in all matters of a business nature, and was accustomed to rely upon her father therein, and that he knew that she was deficient in mental capacity and understanding, and wholly incompetent to transact anything of a business character requiring thought and consideration; that she was induced to settle upon and commute her tract by her father; that at her father's instance she had assisted him in borrowing the sums of money before mentioned, and that he had stated to her that to secure her for the repayment of the sums borrowed for his benefit, he would give her a certain timber culture claim that he then held; and then followed this form of allegation: "4. That on the 15th day of June, 1886, defendant, fraudulently taking advantage of plaintiff's said incapacity, of which defendant well knew, and of her implicit confidence and reliance in him on account of the close relation existing between them, procured her to sign a certain writing,

without paying any consideration therefor, and which writing defendant falsely and fraudulently represented to be a mortgage on said above described premises, to secure the payment of the aforesaid sum of twenty-six hundred dollars. 5. That plaintiff is informed and believes that the said writing is under seal, and is a deed of said premises, and conveys the same, or some interest therein, to the defendant, and that he intends to use the same for his own benefit and to the prejudice of plaintiff, and that defendant has continually assured her ever since the making thereof that she had only executed a mortgage; that it was not until about one year thereafter that she was informed that instead of executing a mortgage she had executed a deed of said lands to her father; and plaintiff further avers that when she asked her father, the defendant, about it, he assured her that it was all right, that she should have her property free and unencumbered, and that he would attend to the matter and see that everything was correct in respect thereof, and that he has repeatedly since that time assured her in most positive terms that her property was in no way encumbered excepting as aforesaid, and that he would see that the matter was all right; that by these false representations and assurances defendant sought to and did lull plaintiff into a sense of security concerning the same, and not until within the past six months has she become convinced that it is his intention to claim the same as his own property, and to swindle and defraud her out of the same, and that he claims said property in fee simple by virtue of a deed executed by plaintiff, and that thereupon she took steps to examine into the matter," etc., with the result that she ascertained the deed to be of record in the office of the auditor of Spokane county. Then follows an allegation of the existence of the deeds to Turner and Abernethy, after which she alleges:

"7. That said defendant, her father, taking advantage

of the confidence reposed in him by her, and of her total incapacity to transact business, and by fraud and misrepresentations, induced her to sign the papers and deeds as aforesaid, and received the considerations arising therefrom, and that she would not have signed and executed the same had she known their true meaning and effect, but that she did not know of the fraud that had been practiced upon her until about ten days ago, and when she was advised by her counsel in regard thereto."

There are also proper allegations as to the conveyance of the tract to the Spokane College. The answer contained a denial of those parts of the complaint which alleged plaintiff to be deficient in mental capacity, and her reliance upon her father, and the charges of misrepresentation and deceit, and set forth that the actual exchange made between the parties was on the 17th day of March, 1884, in this language:

"2. Defendant further alleges that on the 17th day of March, 1884, he purchased said real estate of plaintiff, and in payment therefor assumed the whole of said Ollis mortgage, and conveyed to her a one hundred and sixty acre timber culture claim in Lincoln county, in said state, of the value of about one thousand dollars.

"3. That said property at that time was of the value of not to exceed fifteen hundred dollars, and the consideration thus paid plaintiff by defendant for said real estate was full, fair and ample.

"4. At the time of making said trade plaintiff consulted with her brothers and sisters and other of her friends fully concerning the same, and she knew exactly what she was doing, was as competent as any one to do such business, and was not in any way imposed upon or overreached.

"5. That for convenience the title to said property was left at the time in plaintiff, and remained in her until she conveyed the same as hereinafter alleged.

"6. That thereafter she conveyed portions of said land, as alleged in said complaint, to Turner and Abernethy and to defendant by good and sufficient deeds, and with full and entire knowledge of what she was doing. Such con-

veyances were made by her under the provisions of her sale to defendant, as aforesaid, and in furtherance thereof, and not otherwise."

In the trial of the cause the plaintiff introduced witnesses who testified as to her want of capacity to transact business, and as to the relations of trust and confidence which existed between her and her father. Certain of this testimony went so far as to make her appear to be even weak-minded or childish. Other witnesses testified that in 1884, at the time when the defendant claimed the transaction between himself and his daughter to have taken place, the land conveyed to him was worth from $40 to $50 an acre. The plaintiff herself then became a witness, and proceeded to make a very poor narration of the transactions of which she complains, in the progress of which it appeared, however, that each step taken by her was under the advice and substantially at the dictation of her father. In almost any other cause she would have been an exceptionally bad witness because of the few particulars she was able to give of the transactions in issue. But she maintained without any subsequent contradiction that she had never received any money from her father as the proceeds of any sale of her lands; and while she did not narrate clearly the circumstances attending the execution of any one of the instruments actually executed by her, she maintained stoutly that each time she was assured by her father that what she was about to do was merely in the way of assisting him, and taking care of the mortgage obligation which she had originally incurred as it was continued from time to time by her subsequent obligations. But although she would ordinarily have been a bad witness, as has been said, perhaps in this kind of a case she may be accorded justly the praise of having been an exceptionally good witness. She betrayed no intention either to obscure or pervert any of the facts about which she was inquired of, but seemed to

be honestly ignorant of substantially the whole matter.
This closed the case of the plaintiff. For the defendant
numerous witnesses testified that this land, in March, 1884,
was of little or no value outside of its dependence upon
and connection with Spokane Falls, but was a possible
source of great profit in the future, in the minds of those
who had faith in the outcome of that town. In 1886,
however, when this conveyance was actually made, it was
conceded that the value of the property had greatly ad-
vanced, so that the prices paid by Turner and Abernethy
were no more than the market value of the tracts pur-
chased by them. It was also shown that the plaintiff's
mental qualifications were much better than they appeared
to be from the testimony on her behalf, it being conceded,
however, that her reliance upon her father, even at her then
advanced age of upwards of thirty years, was, as it had
always been, complete and unreserved. Defendant made
no attempt to sustain his allegation that at the time of
making his alleged trade with plaintiff she consulted with
her brothers and sisters and other of her friends concern-
ing the same; and in fact it appeared that several members
of the family knew nothing of it until some time after
it had transpired, and that his daughter had absolutely
no counsel or advice from any person excepting himself.
When a mortgage or deed was to be made by her, all con-
sultation with third persons was by him, and she was not
spoken to in regard to the matter until the document had
been prepared, and was ready to be placed before her for
signature. It did not appear that any of the instruments
signed by her were ever read to or by her. In several
instances an instrument, having been drawn by her father,
was given to her, and she was told to take it down to the
notary's for acknowledgment, which she did without any
word of objection. Defendant showed by several witnesses
that at various times subsequent to the execution of the

deed to him his daughter, in conversation with other persons, had alluded to her land, and stated that she had traded it to her father for a timber culture claim; that she was sorry she had done so, as she had made a bad bargain, but that it was all right, as she had got all it was worth at the time. She also seemed to have a great contempt for the "gravel," as she designated her land, did not think Spokane would amount to much, and was glad she had got rid of it.

Concerning the transaction with the timber culture claim, the facts appeared to be these: That appellant had taken up 160 acres in Lincoln county, some distance from Spokane, as a timber culture claim under the United States land laws; that he had plowed ten acres and put a wire fence around it; that at the time of his alleged transfer of it to his daughter he had made no other improvements upon it, and had planted no trees; that it was fairly good land, which, when title had been obtained to it, would have been worth from $4 to $6 per acre; that his daughter had never seen it; and that at the time of his alleged transfer to her, in 1884, the time allowed him by law to hold the claim was then about twenty days from expiration, unless he should before that time further improve it in compliance with the law. It seems, however, that he had actually not complied with the law, in that he had not cultivated or cropped any portion of the land as required by the statute, although he had plowed five acres in each of the two preceding years, and had, therefore, a very doubtful right to further hold the land at all. He claimed this right to be worth $1,000, and insisted that because of his relinquishment of it to his daughter, and the assumption of the $1,500 mortgage to Ollis, he had actually given her the value of $1,900 for her land, the items being: For the timber culture, $1,000; for the improvements put upon her land by him, $500; and $400 loaned her for the purchase of her land. At any rate, he

relinquished the land to her, and she filed a similar timber culture claim upon it. Her brother plowed five acres for her the first year. Then, at her father's suggestion, she relinquished her claim to this brother; whereupon he filed a like claim upon the same land, and, after holding it for another year, relinquished it again to another sister, who was holding it at the time of the trial. It appeared that this brother and sister acknowledged at all times that they held this land for the benefit of the plaintiff; that is, that whenever anything could be derived from it, or whenever the title to the land should be acquired, as the case might be, the land or the money should go to the plaintiff. But there was a significant fact in that connection, to wit, that the father never lost control over it. It was even said by some of the witnesses, though denied by him, that he had remarked that "they would hold that timber culture claim as long as there were children in the Muzzy family." Subsequent to plaintiff's marriage, which occurred about 1887, she and her husband, being very poor, desired to realize something from the sale of this timber culture claim. Her father at that time had a cash offer for the same from some one, and they urged him to sell it; that is, respondent urged him to sell what he maintains was her property, so that she could have the proceeds of it. This is what appellant says in regard to that:

"Tompkinson and his wife asked me frequently to sell it. Mr. Tompkinson was at my house several times last year, and requested me, and his wife requested me, to sell it and get the money out of it. I had an offer of seven hundred dollars in cash for the claim, but I would not take that. He said he wanted the money out of it."

Certainly nothing more conclusive could appear out of the mouth of witnesses than that, whatever may have been the other facts in connection with this case, appellant had never released or intended to release his practical hold upon that timber culture claim, and was simply using his chil-

dren as a means of acquiring the land, or of holding it for speculative purposes for his own use. At the time of his relinquishment to appellee, even though his rights had been in full preservation, the transfer was in a manner thrust upon plaintiff. She had never seen the land, and she had no ability or means, either present or prospective, to carry on the necessary improvements through the period of eight years during which she would have no title, and nothing else but a speculative chance of sale. The appellant was an able business man, and in the closest possible relations of confidence with his daughter known to the law; yet he gave no word of statement or explanation to her concerning that which he assumed to give her as an equivalent for the perfect title which she possessed. At the most, therefore, all that appellee can be said to have received for her 160 acres of land was the cost of the improvements placed upon it by her father and the money used in paying the government for it. Now, it is undisputed that before she ever had title to it appellant had agreed that one forty-acre tract was to be received by him as an equivalent for his improvements. This shows his own appreciation, even as early as 1882, of the value of the land, and would have left the actual burden on 120 acres of only $400. We use this as an illustration merely, since it may be argued that any contract or promise of the appellee to give a portion of her land to her father was void under the law under which she acquired it.

We shall go no further in stating the testimony in this case, excepting to remark that from the whole case it appears with a great degree of probability that the appellant, who had conceived a very strong confidence in the future of Spokane, and was eagerly acquiring title to all the land he could get in that vicinity, and who at all times, when remonstrated with by the members of his family for the manner in which he was treating his daughter, answered

that "she was indebted to him for getting the land in the first place," really regarded himself as in a manner entitled to the land, as though considering his daughter as only the means by which he had been able to procure the title from the government, forgetting that any such view of the case was utterly inadmissible, especially in consideration of the terms upon which the government parts with its lands, and the prohibition which is laid upon every one against the taking of land for the benefit of another. We are therefore laying out of the question all testimony which was taken on the rebuttal, and all the possible errors which the court below may have made in admitting evidence on the part of the plaintiff, which, if admitted at all, should have been introduced as a part of her case in chief, and upon the admission of which the appellant seriously complains.

We return now to the pleadings and the findings of the court below. It was contended by the appellant, with a great deal of force and earnestness, that the complaint, stripped of all verbiage, based the plaintiff's right of action upon actual fraud, accomplished by the false representations made to her, that the instrument which she signed, and which conveyed her property to appellant, was a mortgage, and not a deed; and that, inasmuch as the court below found that allegation to be not sustained, its judgment should have been for appellant instead of respondent. It was not contended that this court is bound in any manner by the findings of a superior court, or that this is a case merely for affirmance or reversal, but it was urged that in the interest of good pleading this court should find the fact to be as found by the court below, that the misrepresentations did not exist, and that we ought thereupon to dismiss the cause, regardless of any other equity shown by the evidence. The respondent concedes the failure to prove the misrepresentation, and lays aside that allegation.

Indeed, it seems quite unlikely that the appellant would have resorted to any such means to induce his daughter to part with her title in view of the fact that she appears at no time to have been suspicious of her father; and it is altogether probable that, had he requested her to convey the property to him outright merely upon the assurance that it would be better for her to do so, she would have done so without much persuasion or any further reason. We do not think that the evidence discloses on the part of the appellant any design at the time the deed was executed to swindle or defraud his daughter, but consider rather, upon the whole case, that he looked upon this land as in a sense property of the family, of which he was the head, which he had the best right to dispose of as he saw fit, without giving his daughter any reason for his actions. On the other hand, we think it equally probable that the statement of respondent that it was only mortgages that were spoken of to her was made in good faith, and to the best of her recollection at the time, since the testimony shows that it was concerning the mortgages, in the first place, that she was consulted with, and that there was advice given to her by other members of the family, and that, when it came to the transfer of her land to Turner, Abernethy and her father, there was little or no discussion in her presence, no consultation with her, no advice given to her, and that she was a party to no negotiations or any other step in the matter of the transfers excepting the mere execution of the deeds, which she immediately handed to her father.

This leaves the case to be decided upon whatever else there is in it of proof responsive to the allegations of the complaint; and we think we are justified in saying that a critical examination of the fourth paragraph of the complaint makes the *gravamen* of the action to depend as much upon the allegation of want of consideration as that of fraudulent representation. Preceding portions of the com-

plaint, by way of inducement, showed the relation of the
parties, and the mental and business character of the plaint-
iff; and in this fourth paragraph the substantial fact is
stated that the father, while the relation of trust and con-
fidence existed between him and his daughter, and with
knowledge of plaintiff's inexperience, procured her to sign
a certain writing without paying any consideration there-
for. Other portions of the complaint showed that this
writing was a deed, and that the defendant represented it
to be a mortgage, which it was not. It is not stated only
that the appellant *by* the misrepresentation procured the
deed, or that without the misrepresentation the deed would
not have been made. The facts are pleaded: (1) The con-
fidential relation; (2) that there was no consideration; (3)
that there was misrepresentation. This is what the code
requires, and it was proper to state the facts *seriatim,* as
they occurred. In a case of this kind there can be but one
cause of action, embracing all the ultimate facts connected
with the transaction, and upon them the court of equity
grants or refuses relief. If the pleader omits facts which
exist to his knowledge, which would entitle him to relief
on the ground of constructive fraud, and stands upon other
facts which constitute actual fraud only, he is bound by his
pleading, both in the reception of evidence and in the dis-
position of the case, unless he amends in time. But the
statement of facts which support actual fraud does not es-
tablish the case as one based on that theory alone, if there
are other ultimate facts as clearly alleged in the pleading
which would support the theory of constructive fraud,
whether with or without the additional allegations of actual
fraud. The case of *Eyre v. Potter,* 15 How. 42, was re-
lied upon to sustain the appellant's contention on this
point. That was a bill in chancery in the United States
circuit court of North Carolina, and was framed under the

common-law rules of equity pleading. One of the defend-
ants was step-son of the complainant, but the court said:

"The defendants in this case were clothed with no special
function, no trust which they were bound to guard or to
fulfill for the benefit of the complainant. They were not
even the depositaries of any peculiar facts or information
as to the subject-matter of their transactions, or which were
not accessible to all the world, and by an omission or fail-
ure in the disclosure of which they could be regarded as
perpetrating a fraud."

The bill alleged a combination between the defendants
to defraud her by attacking her in the midst of her sorrow
for her deceased husband, and by false representations as
to the condition of her estate, but alleged the existence of
no confidential relation, and merely claimed inadequacy of
consideration. The court said the bill could not be con-
sidered as stating a case of constructive fraud arising out
of some peculiar relation of the parties, but as one of act-
ual, positive fraud, which could not be varied by the estab-
lishment of facts sufficient to create a case under a totally
distinct head of equity. The opinion was, moreover, pro-
nounced in view of evidence which totally failed to disclose
any merit in the complainant's cause. We think this case
and that of *Eyre v. Potter* have little, if anything, in com-
mon which should make the latter an authority on the
point in discussion.

The appellant's next point is, that no presumption of in-
validity in a transaction between parent and child which
throws the burden upon a parent of showing that the trans-
action was fair and just, and that the child was fully ad-
vised of its rights and interests, arises merely from proof of
the relation of the parties. There can be no objection to
that statement as made. Nor can there be as to the next
one, viz.: That in the adjudged cases there was always some
circumstance of actual undue influence, inadequacy of con-

sideration, or other inequitable incident moving the court to action. A child who has attained majority is not a ward of his father, so that their relation is *per se* fiduciary. Nor is their relation necessarily confidential, though doubtless it usually is so, for some time at least, after the majority. We think it will be found that every such case depends upon its peculiar facts. To merely state some of them at once impresses the mind that wrong has been done; for example, *Miller v. Simonds,* 72 Mo. 669, where a young lady, just of age, and still under parental influence, at the instance of her brother conveyed her whole estate to her father just before her marriage; so *Taylor v. Taylor,* 8 How. 183. *Jenkins v. Pye,* 12 Pet. 241, is high authority that a deed from a child to a parent is not *prima facie* void as against public policy. The criticisms upon that case scarcely seem to be just, when the bare point decided is considered. To have held otherwise in that case would have done rank injustice, since no complaint was made for twenty years, and until both parties to the deed were dead. But, conceding all these positions, what have we here? No intention of the respondent to confer a bounty or gift upon her father, no family settlement, but an alleged sale for an alleged consideration of $1,900, before the full consummation of which $3,000 had been received by the grantee for half the property conveyed; $1,000 of the alleged consideration a worthless "claim," and the balance a pre-existing debt; and all this accomplished without advice from or consultation with any person other than the appellant. In *Jenkins v. Pye* the court said, speaking of some English cases, and of the "ingredient" of undue influence found in them all:

"In some cases, although there may be circumstances tending in some small degree to show undue influence, yet, if the agreement appears reasonable, it has been considered enough to outweigh light circumstances, so as not to affect the validity of the deed."

If we seek undue influence in this case, it is easily found. It appeared when the first mortgage was given, and was not wanting upon each occasion when the appellant, without previous consultation with his daughter, himself prepared and presented to her for signature conveyances of her property, without so much as an invitation to read the document or hear it read. His request was her law in the matter, and he must have known it, or he would have taken the trouble to explain it to her. Of reasonableness in this arrangement there was none, unless it be considered reasonable in every case for a father to take from his child her real estate without consideration, she being competent to take care of it herself.

The tenth finding of the court below was that the second mortgage and the three deeds above described were executed by plaintiff by the direction of the defendant; that she did not know the purport of the same, and consequently the effect of the same; that the same were executed without any consideration moving to her; that no attempt was made by the defendant, or any one else, to explain to her the purport and effect of the execution of said instruments; and that, considering her defective mental capacity, inexperience in business, the circumstances under which she was living, and the influence of defendant, her father, over her, it was a fraud to procure her to execute said instruments without having their purpose and effect fully explained to her. These findings fairly present the result of our investigation, and justify the judgment of the court below; for, whatever may be said of the complaint, it is certain to our mind that the gist of the action was not that the plaintiff had lost her property by being deceived by defendant, but that she had in her trust and confidence in him, without sufficient reflection upon the effect of her act, conveyed to him everything she had without any valid

consideration. In such a case equity pays very little attention to whether the property conveyed was of great or little value, nor does it stop to weigh with great nicety all the possible claims which either party may have by reason of the other party not being able to replace him in the precise position he occupied when the transaction occurred.

The action, we think, was brought in time.

The court below set aside the deed to the appellant as to all the land conveyed to him, with the exception of that part conveyed by him to the Spokane College. For the fifteen acres and upwards conveyed to the college the court rendered judgment against appellant for $5,421.15, being at the rate of $350 per acre, which was the value agreed upon by the parties as the true value at the date when it was parted with by appellant on the 10th day of December, 1887. Respondent appealed from this part of the judgment, claiming that the correct measure of damages was not the value at the time of the transfer, but at the date when the suit was brought. The rule adopted by the court was the correct one in this case. It was not contended nor proven that the conveyance to the Spokane College was made in bad faith by the appellant, or with any purpose to place it beyond the reach of the appellee. In this it is clearly distinguished from the cases cited on that point by the appellee, all of which had in them some element of *mala fides.* The court also allowed judgment against appellant for $3,000 received from Turner and Abernethy. The sums thus allowed by the court we think should have been reduced by the sum of $900, with interest thereon from December 17, 1883. This sum represented the value of the improvements put upon appellee's land by her father, $500, and the sum of $400, the government price of the land.

The cause will be remanded to the court below for modi-fication in accordance with this opinion, and, when so modified, will stand as the final judgment.

HOYT and DUNBAR, JJ., concur.

### ON PETITION FOR REHEARING.

STILES, J. — With the main decision in this case we con-tinue satisfied, for the reasons therein given. But in the petition for rehearing the appellant, Muzzy, earnestly en-deavors to obtain a change in our holding in the matter of the $5,421.15 allowed for the land conveyed to Spokane College.

As will be observed, we sustained the rule adopted by the superior court, viz.: That the measure of recovery proper under the facts was the value of the land at the date of the conveyance to the college, and not at the date of the commencement of the action. The appellant, Muzzy, appealed on the whole case, and the appellee, Tompkinson, appealed from this part of the decree, she claiming that at the latter date the property was greatly more valuable than at the former one.

At the hearing the time of counsel for argument was greatly extended, but neither side reached this subject, but left it to the decision of the court on their briefs.

Our decision was against the appellee in this particular, and from the briefs of the appellant we obtained the im-pression that if the main case were decided against him he was satisfied with the judgment for the value of the college land. Upon this point the brief said:

"We think if the court erred in that matter it erred against the appellant, and not against the appellee."

And again:

"No reason can be conceived why the rule of damages in a case of this kind should be more onerous than in tres-pass and conversion, yet in those cases the rule is universal

that the measure of damages is the value of the article at the time it was taken or converted, with legal interest from that date."

Now, however, it is urged that there should have been no recovery at all against appellant for the college land, but that, inasmuch as the Spokane College took the land as a gift, and was, therefore, not a purchaser for value, it should have been made a party defendant, and the trust should have been impressed upon its land to the relief of Muzzy. If it were true that the conveyance to the college was without consideration, perhaps the position of the appellant would be sound. But let us see how the facts stand.

The complaint alleged that the appellant had conveyed certain land to the college, and that its value was thirty thousand dollars, and the answer did not deny either of these allegations. The testimony was all taken so that both sides rested, and the cause was set for argument June 16, 1890, without a word being said upon either side as to the college land. On December 30, 1890, however, upon the plaintiff's motion, the court allowed her to take testimony as to the value of this land, and to introduce the deed to the college. On January 3, 1891, the testimony was taken, the court excluding all inquiry as to the value at the time the action was commenced, but allowing the value at the date of the deed to be shown. At the conclusion of the testimony both parties stipulated the value at the date of the deed to have been $350 per acre. Then the deed was introduced, which expresses a consideration of "one dollar, and other good and valuable considerations," and, after describing the tract conveyed, contains the following:

"It is expressly agreed by and between the parties to this instrument that the tract of land last above described is to be platted by the party of the second part, its successors or assigns, in accordance with the general plan

adopted by said party of the first part in the platting of the addition above mentioned (Muzzy's addition to Spokane Falls), to the end that all streets shall be of the same width as those in the above named addition, and continuation of the same. It is intended to convey eight blocks of land exclusive of streets."

Now, with no plea of a defect of parties, and not a word further said in the case about this land, how can we say that there was no consideration for the deed, or that the Spokane College, when the action was commenced, still held any portion of the tract?

But were it to appear clearly that the conveyance in question was not such as to vest the title in the college as a *bona fide* purchaser, it would be still a subject for discussion whether the *cestui que trust* could not elect either to follow the property into the hands of the voluntary grantee or to obtain in equity the proceeds of the conveyance or the value of the property from the trustee. *Lathrop v. Bampton*, 31 Cal. 17 (89 Am. Dec. 141); *Bradley v. Luce*, 99 Ill. 234; *Long v. Fox*, 100 Ill. 43.

Being satisfied with the correctness of the decision heretofore made, the petition for rehearing will be denied.

Appellant moves this court to render judgment against appellant's sureties on his appeal bond. The statute (Code of 1891, § 1432) provides that the supreme court may render such a judgment for the amount of the judgment, damages and costs referred to in the bond, in case such damages can be accurately known to the court without an issue and trial. But in this case the bond secures to the appellee the payment of all rents or damages to property during the pendency of the appeal out of the possession of which she is kept by reason of the appeal, and as such damages cannot be known without an issue and trial, the motion is denied.

HOYT and DUNBAR, JJ., concur.