[No. 17928.   Department One.   July 6, 1923.]

# Silas S. Howland, *as Executor etc., Appellant,* v. Elizabeth M. Day *et al., Respondents.*[1]

Continuance (11)—Grounds—Absence of Counsel. It is not a sufficiently positive showing to justify a continuance that the wife of one of the attorneys for a party had been injured and it might be necessary for the attorney to go to her.

Same (18)—Absence of Witness—Diligence. A motion for a continuance on the ground of the absence of a witness is properly denied where there was no showing of diligence, or that the witness would be present.

Appeal (444)—Review—Evidence—Harmless Error—Trial De Novo. In a case tried to the court, error cannot be assigned on the prejudice of the judge and limiting the testimony, where the evidence was either admitted or its tendency apparent so as not to affect a trial *de novo.*

Cancellation of Instruments (6, 23½)—Fraud—Undue Influence—Want of Capacity—Evidence—Sufficiency. A conveyance to a hospital in consideration of life support, hospital accommodations and $5 a month will not be cancelled at the suit of personal representatives of the deceased grantor as unsupported by a sufficient consideration, where property of the value of $2,500 to $3,000 was deeded by an old man, afflicted with dropsy, after the refusal of assistance from his relations and the refusal of an old people's home to take the property in consideration of keeping him.

Equity (71)—New Trial—Necessity for Motion. A motion for a new trial is not necessary in an equitable proceeding except in cases of discovery of new material evidence.

New Trial (42)—Application—Court or Judge to Whom Made. An application for a new trial should ordinarily be heard by the judge who presided at the trial, to avoid having the alleged errors of one judge passed upon by another judge of co-ordinate jurisdiction.

Venue (18)—Change of Judge—Prejudice—Motion for New Trial. A motion for a new trial is not an action or proceeding in which a party is entitled to a change of judges, since application for such change must be made at the first opportunity a judge is called upon to exercise discretion in the case.

[1]Reported in 216 Pac. 864.

Appeal from a judgment of the superior court for King county, Carey, J., entered June 30, 1922, upon findings in favor of the defendants, dismissing an action to cancel a deed, tried to the court. Affirmed.

*J. E. McGrew* and *Harry S. Worthman*, for appellant.

*Karr & Gregory* and *H. G. Sutton*, for respondents.

HOLCOMB, J.—Appellant brought this action, in his representative capacity, against Elizabeth M. Day, the Corporate Loan & Security Company, and a number of other defendants, subsequent purchasers, to cancel a deed given by appellant's decedent on December 18, 1916. The grounds for annulling and cancelling the deed alleged were undue influence on the part of Elizabeth M. Day, inadequacy of consideration, and that the same was fraudulently obtained. The complaint alleges that, at the time decedent executed and delivered the deed, he was an aged man, seventy-two years old, and for more than two years prior to his death was sick, weak in mind and body, feeble in health, incapable of transacting his business, in financial straits, and physically and mentally infirm; that his expectancy of life was very short. He died at the Lakeside Hospital, an institution controlled by Elizabeth M. Day, in Seattle, on December 30, 1917. He had been an inmate of the Lakeside Hospital and of another institution called the Pacific Hospital, also controlled by respondent Day, for the greater part of thirty months prior to his death, aggregating in all about twenty-six months.

At the time of the execution of the deed, decedent was the owner of a ten-acre tract of land in King county, Washington, on a part of which was a small nursery; and three lots in South Park, in Seattle, un-

improved, the value of all of which property was alleged by plaintiff to have been at that time $10,500, and at the time of the filing of the complaint, $15,000. The property was all conveyed by the decedent to the Corporate Loan & Security Company, which is conceded to have been merely a holding company for respondent Day and the decedent. The consideration stated in the deed was the sum of ten dollars, but a contract was made and entered into on the same day between the parties, which in part reads as follows:

"That the Corporate Loan & Security Company shall pay to the said John C. Hennessey so long as he shall live the sum of five dollars per month. The said second party (Corporate Loan & Security Company) further agrees to provide said first party with a home and the necessaries of life, including clothing, room and board, hospital accommodations when necessary, and all medicines of every kind and nature prescribed by any practicing physician for the health of the said first party, but the said second party shall not be obligated in any way to pay any physician's bill for medical services unless it shall so elect."

During the latter half of the year 1915, decedent was, at frequent intervals, an inmate of the Pacific Hospital, controlled and managed by respondent Day and her sister, Mrs. Dickey. The Lakeside Hospital was organized and incorporated by respondents Day and Dickey, and George W. Gregory, on April 7, 1916. Elizabeth M. Day was the president, treasurer and superintendent; Anna M. Dickey, vice-president; and George W. Gregory, secretary.

That decedent was in financial straits at the time of the execution of the deed in question and the contract, and had been for some time, there can be no doubt. He had previously given a mortgage to one Conrad for $500, which had been purchased by respondent Day on

March 3, 1916. On April 28, 1916, decedent had executed a note and mortgage to respondent Day, secured by his ten-acre tract of land, in the sum of $200, which was assigned to the Lakeside Hospital, October 19, 1916. On January 17, 1917, which was after the execution of the deed and contract in question, respondent Corporate Loan & Security Company purchased from one Monteville a note and mortgage for $300 which had been executed by Hennessey and secured by a mortgage on the South Park lots. The above mortgages, together with one of $70.50, given by decedent to Dr. Fleming, and some $419.09 in taxes, all aggregating $1,489.59, were the incumbrances existing against decedent's property at the time he made the deed in question.

It is also alleged in the complaint that the Corporate Loan & Security Company failed to keep its contract with Hennessey, and neglected to provide him with proper care, medicines, food and clothing.

Appellant's first claim of error is based on the denial by the court of a motion for a continuance of the trial of the case at the time it was brought on for trial. This motion was based on affidavits of the two attorneys for appellant. One of them was to the effect that the wife of one of the attorneys had been injured in Spokane, and that there might be necessity for the attorney to go to Spokane to return with his wife to Seattle. There was here no such positive showing as to justify a continuance on the ground of the possible absence of one of the attorneys.

The other affidavit for continuance was by one of the attorneys on the ground of the absence of a witness desired by appellant. This witness had left Seattle at some time, not shown when, prior to the setting of the case for trial. The case had been at issue, as shown

by the record, as to all the defendants from some time in February, 1922; the trial commenced on June 22, 1922, and there is absolutely no showing of any diligence in procuring the attendance of the witness at the trial, or the taking of her deposition, or that there was any assurance that she would be present at any time the cause might be continued to. There was no abuse of discretion in denying the continuance.

The second and third assignments of error are that the court showed passion and prejudice against appellant and his attorneys during the trial; misconduct preventing plaintiff from having a fair trial; error in not allowing plaintiff to present testimony showing all the circumstances surrounding the transaction in question; and limiting appellant to testimony covering the execution and delivery of the deed and contract.

These assignments are very much involved, but all correlated. It is manifest that counsel for appellant misunderstood the attitude of the trial judge at times. The trial court insisted from the beginning that it was not the business of the courts to relieve from bad bargains merely for the reason that the bargains were bad; but that it was necessary to show that the contract had been induced by fraud, deceit or overreaching of some kind. Appellant was not prevented from showing by testimony that the value of the property, as then contended, was about $10,000 or $11,000 at the time the contract was made, and about $15,000 at the time of trial. The court conceded to appellant that the contract was a bad one, saying that "anybody knows that this is a bad contract." As we shall presently show, we are not inclined to entirely agree with the trial court in that respect. To discuss all these assignments at length would unduly extend this opinion to the benefit of no one. Suffice it to say that either the

evidence was admitted that appellant desired to intro-
duce, or we can see from the record its tendency and
the inference therefrom, and we are trying the case
*de novo*.

We have ourselves laid down the rule, too often to
need citation, that parties cannot be relieved from their
bad bargains merely because they are bad bargains.
There must be something else in addition to great
inequality in the bargain, viz., fraud, undue influence,
coercion and the like. Fraud is never presumed. It
must be proven by evidence that is clear, cogent and
convincing. Although every facility and opportunity
should be accorded in such a case, where the allegations
were definite, positive and sufficient, to show all the
circumstances, conditions, relations and acts surround-
ing the transaction, we think they were permitted and
shown in the trial of this cause. Much irrelevant mat-
ter was attempted to be shown.

In 1915, the decedent's ten-acre tract of land south
of Seattle had upon it a small shack and a few young
fruit trees, and a few acres cleared. Decedent had
been living alone in the shack for some time. In June,
1915, not feeling well, he consulted Dr. Starbuck, a
Seattle physician, who pronounced his ailment inter-
stitial nephritis, or dropsy, and advised decedent that
he immediately go to a hospital where he could receive
care and better food. Hennessey objected to going to
a hospital, declaring that he had no money with which
to pay expenses. The doctor then consented that he
stay on his place a while longer, coming in to see him
frequently. Not improving in his condition, Hennessey
yielded, and about the first part of July went to the
Pacific Hospital, then operated by respondent Day.
Shortly after going to the hospital, Mrs. Day asked
him about his hospital expenses, and he stated that a

relative would take care of the expense, and she had
him write to this relative, a nephew, who lived some-
where in Illinois. This relative sent a check for $27
to apply on the hospital bill, and at the same time
wrote a letter stating that he would not continue to
pay Hennessey's hospital expenses, and that something
would have to be done with his property so as to make
it available to take care of him. Hennessey had as
known relatives this nephew and two sisters, living in
the middle west, one of the sisters having died since
the death of Hennessey.

A short time after going to the Pacific Hospital,
Hennessey improved somewhat, and returned for a few
weeks to his property, but his dropsical condition re-
turned, and upon the advice of Dr. Starbuck he went
back to the Lakeside Hospital, then being operated by
respondent Day, she having removed from the Pacific
Hospital to that hospital. From that time on until his
death on December 30, 1917, Hennessey remained in
the Lakeside Hospital, with the exception of an oc-
casional trip out to his property, where he would re-
main for several days or weeks at a time. He was an
inmate of the hospitals, receiving his food, clothing,
medicine, and all other necessary and reasonable care
for a total period of from twenty-six to thirty months,
for which services no payments were made other than
the twenty-seven dollars sent by his nephew. During
that time he was able to get around the city and to
go out to his property without assistance, with the ex-
ception of occasions when he would have attacks, and
with the exception of the last two or three months of
his life, when he became almost blind. Respondent
Day went with him on many occasions around the city.
She took him to an eye specialist on several occasions,
and paid the cost of the treatments from her funds. He

had the services of Dr. Starbuck, who treated him and administered medicines as he deemed it necessary, for which he was paid nothing by decedent, but a charge of $1,000 was made by him and assumed by respondent Day.

After Hennessey's relatives refused to assist him, and his doctor told him he must be in some place where he could secure better care and better food, he attempted to get into the Kinney Home, an old people's home in Seattle, and to use his property for the purpose of so doing. The managers of that institution would not accept his property and make arrangements for keeping him for the remainder of his life. Being unable to make this arrangement, he made the arrangement in controversy here. Although the corporation which held the property for his benefit was not obligated to pay for the services of any physician unless it elected so to do, the fact is that decedent had the services of a physician at all times, both before and after the contract was entered into. It is conceded by the principal respondents here that the Corporate Loan & Security Company was purely a holding company in this matter, the beneficial title to the property being in respondent Day, as manager of the Lakeside Hospital, and the obligation rested on her of fulfilling the terms of the contract for the benefit of Hennessey.

As to the value of the property at the time of the transaction in question, while the executor testified as a witness at the trial, valuing it at ten to eleven thousand dollars at the time of the transaction, and at about fifteen thousand dollars at the time of the trial, there is considerable conflict in the evidence as to its value at the former time. One witness placed a value of three thousand dollars on the ten-acre tract at the time of the conveyance, while another witness called

by appellant placed it at seven thousand dollars. It is evident that the property was not greatly in demand, for it was not readily accepted as security by lenders of money, or by persons able to care for one in the situation of decedent.

After respondent Day acquired it, she had it platted, water put on it, and developed it, expending about eleven thousand dollars on it, so that, at the time of the trial, it was quite valuable and salable. It is probable, therefore, that of the fifteen thousand dollars value at the time of trial, ten thousand or eleven thousand dollars had been added to it after the property was acquired by respondents. As there were incumbrances against the property amounting to about fifteen hundred dollars at the time it was conveyed by decedent, leaving a net value of twenty five hundred to three thousand dollars, it is quite apparent that there was no such inadequacy of consideration for the property, in the situation decedent was in, and the prospective great expense for his care and maintenance, as to make the contract a very bad bargain on his part. On the other hand, it appears to us that it was rather a fair bargain for him.

There is no evidence that respondent Day and the Corporate Loan & Security Company failed to perform their part of the contract with decedent. In fact, according to the doctor who attended him, he received very good treatment, and a great deal of personal attention from respondent Day and the hospital attendants, receiving all the care and attention that he should receive.

While there is some evidence on the part of neighbors of Hennessey and of the hospital that he did not receive good attention, we think the testimony of the one who is most competent to judge and to observe

entitled to the most consideration and credence, and on the same basis, we think that the testimony of Dr. Starbuck, who attended Hennessey during all the time he was at the hospital and ailing, and before that, to the effect that the mind of Mr. Hennessey was exceedingly acute in regard to financial matters, and that his mental condition was very good during all the time that he was treated by Dr. Starbuck, and that Hennessey got everything absolutely straight, is the most competent and convincing evidence as to the mental condition of decedent.

The above state of facts differentiates this case from the cases of *Kennedy v. Currie*, 3 Wash. 442, 28 Pac. 1028; *Muzzy v. Tompkinson*, 2 Wash. 616, 27 Pac. 456, 28 Pac. 652; *White v. Johnson*, 4 Wash. 113, 29 Pac. 932; *Hattie v. Potter*, 54 Wash. 170, 102 Pac. 1023, relied upon by appellant. The facts in this case bear more similarity to the cases of *Ford v. Jones*, 22 Wash. 111, 60 Pac. 48, and *Alexander v. Lewes*, 104 Wash. 32, 175 Pac. 572.

In the last case above cited, a contract was made by a man seventy-four years of age, by which he agreed to convey 237½ acres of land of the value of twelve thousand dollars, in consideration of support and care for the rest of his life. This did not include such specific and expensive care as hospital and medical care and attendance. The grantees had only performed their services for a period of four days. In that case we said:

"It will thus be seen that the relief was denied upon the grounds generally of the inequity of appellant's claim, in that too much would be granted for too little in return; that the value of the property would be disproportionate to any service that could be rendered in the brief expectancy of life remaining to Frederick Lee Lewes;  .  .  .

" . . . in the absence of fraud or overreaching, the testator, being competent, can fix upon anything that is not in itself unlawful as a consideration and put his own value upon it, whether it be greater or less. This is so in this class of cases even in greater degree than in ordinary cases, for the courts have rarely if ever undertaken to fix the value of a consideration sounding in personal service. They have recognized the futility, if not the impossibility, of measuring in dollars and cents love, affection, care, service and attention to the aged and infirm."

The above very nearly fits the conditions existing in this case. We are well satisfied that there was no very great inadequacy of consideration for the conveyance and contract, no deceit, overreaching, or fraud; no mental incompetency on the part of the grantor at the time of the transaction, and no failure of the consideration agreed to be given. This conclusion answers the chief contentions made by appellant.

Appellant also contends that the trial court erred in not granting a new trial, in passing upon the motion for a new trial himself, and in not granting a change of judge to another judge.

A motion for a new trial is never necessary in an equitable proceeding, or in a case tried to the court without a jury, except in cases of discovery of new material testimony which may change the result, and in some other exceptional cases.

While it is true that another judge than the trial judge has authority and jurisdiction, under our statute, to pass upon a motion for a new trial in case of the cessation of the term of office of the trial judge, or his death, removal, or incompetency, nevertheless the application for a new trial should ordinarily be heard and determined by the judge who presided at the trial. 29 Cyc. 922. Otherwise we should have the unheard-of

procedure of persons feeling aggrieved having the alleged errors of one judge passed upon by another judge of coordinate jurisdiction, and thus having, in effect, two appeals. This could not be tolerated.

A motion for a new trial is not an action or proceeding, Rem. Comp. Stat., § 398, as contended by appellant. A new trial is, as defined by [P. C. § 8224]: "A re-examination of an issue in the same court after a trial and decision by a jury, court or referee."

A motion for a re-examination of the same action or proceeding is not an action or proceeding, and a party is, in no event, entitled to a change of judge upon a motion for a new trial being made. A motion for a change of judge, under our statute, must be made at the first opportunity when the judge is called upon to exercise some discretion in the case. At the time he is called upon to exercise the last discretion that he may exercise in the cause is not within the rule of our decisions.

The motions for change of judge and for a new trial were both properly denied.

Judgment affirmed.

MAIN, C. J., MACKINTOSH, BRIDGES, and MITCHELL, JJ., concur.