[No. 32956. Department Two. December 30, 1954.]

STEVE ROGICH et al., *Respondents*, v. EDWIN O. DRESSEL, SR., *Appellant.*[1]

[1]Reported in 278 P. (2d) 367.

*Del Cary Smith, Del Cary Smith, Jr.,* and *Trumbull & Ek,* for appellant.

*Edmund T. Brigham,* for respondents.

DONWORTH, J.—Defendant appeals from a judgment establishing an express oral trust in ten thousand shares of mining stock, declaring the trust ended by his disavowal of it and his consequent conversion of the stock, and awarding each of the two plaintiffs a money judgment for one third of the value of the stock at the time of the conversion, less certain deductions.

The facts which give rise to this lawsuit may be summarized as follows: Plaintiff Rogich (hereafter called Rogich when referred to individually) and plaintiff Folsom (hereafter called Folsom when referred to individually) were employees of the Pend Oreille Mines & Metals Company, a corporation, during all of the period involved in this action. Rogich was master mechanic for the company. Folsom was a diamond drill foreman.

Defendant (hereafter called Dressel) owned and operated a general store in Metaline Falls in 1938, when the incident which gave rise to this action occurred. He had owned and operated the same store since about 1914 and continued so to do until 1943. At that time, he sold the store to his son but continued to be in and work around the store thereafter during all of the period involved in this action.

Rogich had traded almost exclusively in Dressel's store since 1920, when Rogich was married, and had spent approximately a thousand dollars a year in the store from that time until 1951. Rogich had confidence in Dressel and considered him a friend. Dressel likewise had enough confidence in Rogich to allow him to keep a running open account at the store during all of those years. When Rogich was paid by his employer, he usually cashed his pay check at Dressel's store, and Dressel would apply some of the money from the check on Rogich's account and pay the remainder over to him. Rogich had borrowed small sums of money from Dressel on a number of occasions. Dressel required no note from Rogich as evidence of such loans.

Folsom had known Dressel for only three years prior to 1938, and did not know him as well as Rogich did, though Folsom did trade at Dressel's store prior to and after 1938.

In June and July, 1938, a diamond drilling crew, employed by Pend Oreille Mines & Metals Company (hereafter called Pend Oreille Mines), of which Folsom was foreman, began diamond drilling on certain property owned by the Metaline Metals Company (hereafter called Metaline Metals), to determine whether the property contained ore of sufficient value to justify mining it. Pend Oreille Mines owned fifty-one per cent of the stock in Metaline Metals. Early in July, 1938, the diamond drilling disclosed the location of a fairly extensive ore body containing high grade lead ore (fifty to sixty per cent lead). Since it was profitable to mine ore containing ten per cent lead at that time, the discovery was considered a very rich one by everybody who knew about it. Rogich and Folsom, in the course of their employment, saw the diamond drill cores containing the rich ore. They asked a high official in Pend Oreille Mines if it would be all right for them to buy Metaline Mines stock and were assured that there was no objection to their doing so.

Neither Rogich nor Folsom had any money with which to buy stock. Rogich suggested to Folsom that they borrow five hundred dollars from Dressel to buy some stock, and the two men went to Dressel's store sometime in the early part of July, 1938, to ask about borrowing money.

Concerning the meeting with Dressel, Rogich testified on direct examination as follows :

"A. Me and Folsom asked Mr. Dressel if we can borrow $500 to buy Metaline Metals stock. After he heard us, then he, Mr. Dressel said, 'Well, what are you going to do with the money?' Naturally we, me and Mr. Folsom, come up and told him we wanted to buy Metaline Metals stock, and one thing after another. I can't recall if we had the diamond drill core to show that night but I am sure that Mr. Dressel know, . . . Q. Tell us as nearly as you can remember what you said about it. A. I told him that the core out of the diamond drill hole was very rich, and Mr. Dressel said, 'Well, that is the best news I ever heard.' He didn't say anything about the loan. Then he turns around, Mr. Dressel turns around and said, 'Well, I tell you; I got $800 that isn't working, what is the matter with me buying that stock,

Metaline Metals stock, and put on our names between the three of us?' And then the conversation went on— Q. What did you say to that? A. I don't believe I answered anything there. And Mr. Folsom, I presume he said something about it. And the conversation went on, and when we parted Mr. Dressel agree that he was going to buy the stock for us. Q. For 'us.' Whom do you mean by 'us?' A. Between us three, me and Dressel and Folsom.    . . ."

Folsom's testimony on direct examination about the same meeting was as follows:

"A. He [Rogich] suggested we go down and see Mr. Dressel at his store. We went down after work and we went in and Steve addressed Mr. Dressel and told him we would like to buy some Metaline Metals stock but we were broke and we didn't have any money so we came to see if we could make some arrangements so we could get some of this stock. So Ed [Dressel], he talked around a while about it and finally he says, 'I got $800,' he says, 'that isn't working—' Q. Pardon me just a minute. Was there any mention as to how much you wanted to borrow? A. Well, we just— as I recall— I don't just recall whether it was any specific amount, but it seems to me like we wanted to get some stock. Q. Go ahead. A. So we didn't make any agreement as to about how much we wanted to get at that time, so we talked it over, and the next thing we knew Ed says, 'Well,' he says, 'I will get the stock.' Q. Did he say anything at that time as to paying any money over? A. Yes, he said he had about $800 that wasn't working at that time, as I recall the conversation, so he went to work and started buying this stock. Q. State the conversation. What did he say about buying the stock? A. Said that he would buy the stock for the three of us, Mr. Rogich, Mr. Dressel and myself. Q. And how much did he say? A. He didn't say how much he was to buy. Q. Did he say how much money he was going to use? A. Eight hundred dollars that he had to use—not that he was going to use it, but that is what he said he had. Q. Was there anything said there at that same time and place in regard to whose name the stock would be bought in? A. No, there wasn't. He was to buy the stock. Naturally it would be in his name. Q. At any rate, you assumed that? A. That is right. Q. Did you object? A. No. Q. Was that all of that conversation at that time? A. Well, as I recall that is about all there was."

In his testimony, Dressel said that Rogich and Folsom had asked to borrow money from him, possibly in 1938, to buy Metaline Metals stock, that he refused to loan them anything, and that he made no agreement with them to buy any stock for the three of them.

Prior to 1938, Dressel had purchased seven thousand shares of Metaline Metals stock. On July 12, 1938, he bought a block of five thousand shares, paying $7\frac{3}{4}$ cents a share. He purchased an additional five thousand shares (in 1,000 share lots) on July 29, 1938, paying $8\frac{1}{2}$ cents a share for three thousand shares and $8\frac{1}{4}$ cents a share for the other two thousand. The plaintiffs each testified that, during the next few weeks after the oral trust agreement was made, Dressel told them that he had purchased ten thousand shares of Metaline Metals, paying from six cents to a little more than eight cents a share. Plaintiffs further testified that when Dressel had purchased ten thousand shares they each told him that that was as far as they wanted to go in buying stock under the agreement. Dressel purchased 1,500 more shares of Metaline Metals for $4\frac{1}{2}$ cents a share in November, 1938, and 500 more shares in December, 1938, and 5,000 more in March, 1939, paying four cents a share on the last two purchases. Dressel admitted making the several purchases of Metaline Metals stock above described.

Plaintiffs each testified that in 1940 they went to Dressel's store and offered to pay him interest on the money he had used to buy stock for their benefit. They did not know exactly how much he had spent for the ten thousand shares and never did learn until after this action was filed in 1952. Both plaintiffs testified that Dressel refused to accept any interest from them, saying, "A deal is a deal."

Rogich testified about the 1940 meeting as follows:

" . . . we promised to pay him interest on it. Q. You promised to pay him interest. You mean promised or offered? A. Offered. Mr. Dressel and us, me and Mr. Foley [Folsom], agree that no one can sell that stock without the permission from all three of us agree to sell the stock, and if the stock ever was sold, whenever it came to sell, that we was to pay him six per cent interest on our share. Q. Did

you agree to that or did you just offer to? A. We just offered. Q. What did he answer to that? A. He didn't say yes or no or anything. Q. To what offer of yours did he make the reply, 'No, a deal is a deal?' A. I suppose for offering him interest."

Folsom testified about the same meeting as follows:

"Q. Will you tell us very carefully and slowly just what was said by each person there? A. Well, we went in and we said to Ed, well, we was very thankful for what he had done for us and we thought it would be no more than right that we should pay him something for the use of his money that he was using, and he said 'No,' he says, 'a deal is a deal.' He says, 'That is that.' So when he said that we just took his word that that was correct and that is what he meant and we just let it go at that."

Dressel denied that any such meeting as that described by plaintiffs ever took place and denied ever telling them, "A deal is a deal."

Rogich testified that during this period subsequent to July, 1938, he continued to trade at Dressel's store continuously and was in there frequently, but that he did not speak to Dressel about the stock transaction again until October, 1951, eleven years later. Rogich's testimony on cross-examination was:

"Q. The only three talks you had with him relative to this entire transaction was the first one in 1938, the second time in 1940 when you offered to pay some interest, which he declined, and the third one was in October of 1951? A. That is right."

According to Folsom's testimony, he contacted Dressel "in 1940, 1941, and 1942, and possibly in 1943" to tell him about prospecting developments on the Metaline Metals property and to talk about their stock transaction, but that he never talked to Dressel about the "deal" from 1943 to 1951.

Plaintiffs' complaint alleged, and defendant's answer admitted, that in 1945

". . . Metaline Metals Company was absorbed by Pend Oreille Mines and Metals Company and stock in the one was exchanged for stock in the other in the ratio of 10

shares of Metaline Metals Company stock surrendered for each share of Pend Oreille Mines and Metals Company stock issued. . . ."

Both Rogich and Folsom testified that they knew at the time that their employer, Pend Oreille Mines, was in May, 1945, in the process of absorbing Metaline Metals, and that they were in favor of the transaction. Both said they did not talk to Dressel about the surrender of Metaline Metals stock for Pend Oreille Mines stock. Dressel did not testify as to any of the details of the transaction by which he surrendered the Metaline Metals stock for Pend Oreille Mines stock.

At the time of the exchange, Dressel owned 24,000 shares of stock in Metaline Metals, including the 10,000 shares purchased in July, 1938. He surrendered the 24,000 shares of Metaline Metals stock and received 2,400 shares of stock in Pend Oreille Mines.

Folsom testified that he knew that Pend Oreille Mines had paid at least one dividend after the stock transfer in 1945, but neither he nor Rogich made any claim to a portion of the dividend at that time (nor is any claim being made thereto in this action).

After the merger in May, 1945, Dressel had a total of 4,400 shares of Pend Oreille Mines stock because prior thereto he already owned 2,000 shares which he had purchased years before. He sold 1,000 shares of Pend Oreille stock in June, 1945, at $1.95 per share, and in August, 1950, he sold two blocks of 500 shares each, one for $6.20 a share and the other for $6.25 a share.

In 1951, the price of Pend Oreille stock had risen to about ten dollars a share, and in July, 1951, Folsom went to Dressel's store and spoke to him about the stock transaction, as follows:

"I went in and I asked Ed, I says, 'Well,' I says, 'Ed, how about that stock deal.' I says, 'you and Steve and I had?' He kind of looked surprised. 'Gosh,' he says, 'I don't remember.' So I says, 'Well, my goodness,' I says, 'You don't remember?' I says, 'It is sure an honest deal. We all were in together on it.' I says, 'If you don't remember it, why

don't you see Steve and find out what Steve says?' He said he would . . ."

A month later, Folsom saw Dressel again and asked if he had contacted Rogich. Dressel had not. About the first of October, 1951, Folsom again saw Dressel and made an appointment for Rogich and him to meet Dressel at the store the night of October 10, 1951. The three men met at the store that night. Rogich and Folsom testified that they asked Dressel about the stock transaction and that he at first said he could not remember the agreement made in 1938, but that later he remembered it and told them that he had "sold that stock," for about $1.40 a share. Both plaintiffs said they demanded that Dressel make a settlement of the transaction by selling the stock (then worth $10.20 a share) and dividing the proceeds. Dressel denied that he held any stock in trust for plaintiffs but offered to pay Rogich and Folsom $250 each to "settle the deal."

Dressel left the two men alone together for a short time to decide whether to accept his offer. They decided to accept $250 apiece in settlement of their claims and so advised Dressel, but refused to take any checks in payment. Since Dressel did not have $500 in cash in the store, Rogich and Folsom agreed to come to the store after work the next day and receive $250 apiece in cash. Before the two men left the store that night, Dressel told them that he was not saying that he did not have any Pend Oreille stock.

Folsom went to the store the next day after work and was paid $250 in cash. He signed a receipt, written by Dressel, reading as follows:

"Oct. 11, 1951

"This is to certify that I, T. C. Folsom, have this day received from E. O. Dressel the sum of Two Hundred Fifty Dollars ($250.00) to me in hand paid by said E. O. Dressel, said sum being in full and complete payment for any interest whatsoever in a verbal purchase agreement pertaining to Metaline Metals common stock which was later exchanged for Pend Oreille Mines & Metals Co common stock."

Rogich did not return to the store to receive the $250 payment which he had agreed to accept. A day or two later, his

wife was in the store to purchase some paint and Dressel stopped her on her way out to talk to her. She testified concerning that meeting as follows:

"He said, 'Waneta, just a minute.' I stopped. He said, 'Did I hurt Steve's feelings or make him mad the other night?' And I said, 'Well,' I said, 'I don't know, but,' I said, 'you did destroy his trust in you.' And he said, 'Well,' he said, 'Isn't he going to come down and take care of that matter?' I said, 'No, he is not going to sign.' He says, 'Well, Foley signed it.' And I said, 'Well, that is a different thing if Foley wanted to sign, because,' I said, 'we feel we have traded here for thirty years and given you our business which amounts to about a thousand dollars a year. There should be a little more consideration than that.' And he said, 'Well, I don't know.' 'And furthermore,' I says, 'Steve figures that if he hasn't his full share coming, he doesn't have anything coming. If he is not entitled to one-third, he isn't entitled to $250 and he would rather not take anything than take the $250.' And he said, 'Well,' he said, 'I tell you.' He said, 'I have sold that stock.' He said, 'I have a paper in the bank and I will bring that down and Steve can come and see it.' And I said, 'I don't think he will come in.' . . ."

Rogich never accepted the $250 offered him. He saw Dressel several times between October 10th and the time of the commencement of this action, but no compromise could be reached between them because Rogich insisted that he was either entitled to a full one third of the value of the stock or he was entitled to nothing.

Dressel testified that at the meeting of October 10, 1951, he told plaintiffs that he did not owe them a cent. He said that he offered them the settlement because he wanted to avoid a lawsuit, because they were friends and had been good customers at the store, and because he realized that their claims had a "nuisance value."

The trial court took the case under advisement at the conclusion of the trial and later filed a memorandum opinion holding for plaintiffs. In the opinion, the court said he found plaintiffs' testimony "very convincing" on the issue of the establishment of the oral trust. Findings of fact, conclusions of law, and a judgment favorable to plaintiffs were entered. The judgment was based on the value of Pend

Oreille stock on October 10, 1951, being the date of Dressel's repudiation of the alleged trust. Defendant moved for a new trial, contending, among other things, that, in any event, plaintiffs were not entitled to a money judgment against him but only to a delivery of their one-third share each in the stock which had been the subject of the alleged trust. The motion for a new trial was denied, and defendant has appealed.

Appellant makes fifteen assignments of error in support of these propositions: (1) the creation or establishment of the express oral trust was not proven by clear, cogent, and convincing evidence; (2) there was no consideration to support the contract to establish a trust; (3) the action was barred by the statute of limitations or by the doctrine of laches; (4) respondent Folsom cannot recover because of his written release of his claim against appellant, and (5) even if entitled to recover, respondents should only be awarded their respective shares of stock allegedly held in trust and were not entitled to a money judgment based on the value of one third of the stock on the date appellant denied the existence of the trust.

The crucial issue of fact in this case is the existence or nonexistence of the express trust. On this issue, the testimony of appellant is in direct conflict with that of respondents. The other facts stated above are for the most part undisputed.

We will discuss appellant's five contentions in order. Both parties agree, under point (1), that an oral express trust in personal property is valid in this state if established by clear, cogent, and convincing evidence. But appellant argues strongly that respondent's evidence is far from clear, cogent, and convincing.

On the issue of the establishment of the trust, the court had to choose between two diametrically opposite versions of the conversations between the parties in July, 1938, and decide whether, after evaluating all the evidence in the case, respondents had proven the affirmative of that issue by evidence which was clear, cogent, and convincing.

Appellant argues that we should reject the trial court's findings on this phase of the case because of what appellant calls the "incredible" fact that Rogich said nothing to Dressel about the existence of the trust for eleven years (from 1940 to 1951), though Rogich was in the store regularly and saw Dressel frequently during that period. Folsom likewise said nothing to Dressel about the trust agreement for eight years (from 1943 to 1951), though he traded at the store and saw Dressel often. These long periods of silence on the part of the two men may be regarded with suspicion in passing upon the factual question as to the existence of the trust. But it should not be forgotten that respondents were workmen of limited education who were dealing with a successful merchant whom they had known and done business with for several years. They respected and trusted him. Rogich had traded in appellant's store for more than twenty years and testified that he had complete confidence in him. The trial court took the long period of silence on the part of respondents into consideration and, after balancing it against their testimony, concluded that the express trust in Metaline Metals stock had been proven by clear, cogent, and convincing testimony.

From our examination of the record, we cannot say that respondents' case was unsupported by evidence or that their testimony was so contradictory or inherently lacking in credibility as to justify us in concluding that the trial court erred in holding that respondents had proven the establishment of the trust by clear, cogent, and convincing evidence. The evidence on the issue was bitterly conflicting. The trial court accepted respondents' testimony as being sufficiently clear, cogent, and convincing to establish the trust, and rejected appellant's testimony. Its reasons for so doing, stated in its first memorandum opinion, are sound. Therefore, we will accept as a fact the trial court's finding that an express oral trust in ten thousand shares of Metaline Metals stock was created in July, 1938, for the equal benefit of respondents and appellant, the stock to be purchased by appellant with his funds and to be held

and sold only when the three parties should agree upon a sale.

As to appellant's point (2), we will not enter into any extended discussion of the testimony relative to the sufficiency of the consideration to support the contract creating the trust. We hold simply that the information which respondents conveyed to appellant about the probable presence of an ore body of considerable value on the Metaline Metals property (as indicated by the core obtained by diamond drilling) was a sufficient consideration to support the trust agreement. A further consideration (ignored in the briefs of both parties) was the fact that appellant would share equally with respondents in any profit realized upon the sale of the trust property, which all parties anticipated would increase in value because of this discovery.

Appellant's point (3) is that respondents' right of action is barred by the statute of limitations or by the doctrine of laches. We held in *Tucker v. Brown*, 20 Wn. (2d) 740, 150 P. (2d) 604, that an express trust is not subject to the operation of the statute of limitations until it is terminated or is repudiated by the trustee. This court also there held that no diligence in presenting or urging a claim to trust property is required of a beneficiary until there has been a termination or a repudiation of the trust by the trustee.

In this case, appellant contends that his conduct in turning in the Metaline Metals stock for Pend Oreille Mines stock in 1945 was an act of "sole ownership" and thus a repudiation of the trust. We do not so view the transaction. If appellant voted in favor of the merger or did not vote at all, he had no choice but to accept Pend Oreille stock for the Metaline Metals stock tendered in exchange. There is nothing in the record to indicate that he voted against the merger. Respondents knew that Pend Oreille Mines, their employer, was absorbing Metaline Metals and had no objection to the transaction. The exchange of the stock was not a repudiation of the trust, but merely an involuntary change in the corpus to which no beneficiary objected (not even appellant).

■ From the fact that Pend Oreille Mines paid a dividend on the stock in 1945 subsequent to the merger with Metaline Metals, appellant argues that he repudiated the trust when the dividend was received and retained by him. Respondents presumably knew of the dividend payment (Folsom definitely did, according to his testimony) but made no claim to two thirds of the dividend presumably because they knew that, under the trust agreement, they owed appellant more than the amount of the dividend for their share of the purchase price of the stock. Under these circumstances, we cannot hold that respondents' failure to claim their share of the 1945 dividend, or appellant's retention of the dividend for himself, would amount to a repudiation of the trust so as to start the statute of limitations running or to constitute laches.

■ The fourth point urged by appellant (relating only to Folsom) must be sustained. Folsom signed a release of his claim against appellant as to the cause of action here sued upon by him when the very existence of the trust agreement was bitterly disputed between the parties. Under the pleadings in this case, the burden was upon Folsom to meet the issue tendered by appellant's affirmative defense of accord and satisfaction by presenting evidence showing that he (Folsom) had been induced to enter into the release agreement by fraud on the part of Dressel. Fraud must be proven by evidence which is clear, cogent, and convincing. *Cerkonek v. Dibble*, 42 Wn. (2d) 451, 256 P. (2d) 488.

Folsom presented very little evidence of actual fraud in inducing him to execute the release, but relied principally on his contention that the amount paid him in the settlement was so inadequate as to be constructively fraudulent. The trial court held (1) that there was no consideration for the release Folsom signed because his claim against appellant was "liquidated and possible of exact computation," and (2) that the sum of $250 paid by appellant to Folsom for the release in settlement of his claim (for the total sum of $3,400) was so "grossly inadequate" as to work an "unconscionable wrong" upon him.

On the issue of lack of consideration, the trial court's ruling overlooks the fact that the existence of the contract upon which the claim was founded was the principal matter in dispute. The law favors the voluntary settlement of disputes or conflicting claims between parties. Therefore, we frequently have held that the settlement of a *bona fide* dispute or a doubtful claim, if made in good faith, is sufficient consideration for a compromise to settle such claim. *Opitz v. Hayden,* 17 Wn. (2d) 347, 135 P. (2d) 819, and cases cited therein. The settlement of the dispute between the parties over the very existence of the trust was a consideration sufficient to support the compromise and the resulting release.

The trial court's ruling that the $250 paid by appellant for Folsom's release was "grossly inadequate" overlooks the fact that, but for the settlement, Folsom would have been obligated to repay appellant one third of the sum he spent in purchasing the ten thousand shares of Metaline Metals stock ($269.17) plus $213.83 interest thereon from 1938 to 1951. Thus the total benefit accruing to Folsom, as a result of the settlement, was equivalent to $733. Such a sum is not so grossly inadequate in the settlement of a claim for $3,400 as to warrant its being set aside as constructively fraudulent.

Even if this release be considered as a bad bargain, we must apply the rule followed in this state that parties who are competent to contract will not be relieved from a bad bargain they make unless the consideration is so inadequate as to be constructively fraudulent (*Howland v. Day,* 125 Wash. 480, 216 Pac. 864). We cannot agree with the trial court that the consideration was so inadequate as to be held unconscionable. We find no constructive fraud in the settlement contract which Folsom entered into with appellant whereby Folsom released his claim against appellant. We, therefore, must conclude that Folsom's cause of action is barred by this accord and satisfaction, and must be dismissed.

Appellant's last contention is that, if respondents were entitled to recover at all, they should receive one third

of the ten thousand shares of stock held by him and not be awarded a money judgment based on the value of such stock as of October 10, 1951 ($10.20 per share). This contention is urged because, though the record does not show it, the attorneys for both parties stated in oral arguments in this court that the value of the stock had dropped considerably between October 10, 1951, and the time of the trial. It so happens that the date of the repudiation of the trust by appellant marked the highest market value which the stock reached at any time material to this controversy.

It is appellant's position on this phase of the case that respondents are entitled only to their share of the stock, and not to its value, because by the terms of the trust agreement respondent did not have to sell the stock until *all three parties* agreed to sell. Appellant says that, since he did not agree to sell on October 10, 1951, he could not have been compelled to sell on that date, and hence respondents were not entitled to the value of the stock as of that date, but should only receive their share of the stock (now considerably depreciated).

The difficulty with appellant's position is that his repudiation of the trust on October 10, 1951, while he held the stock in his possession, amounted to a conversion of respondents' share of the stock. Consequently, his act of conversion wiped out the earlier agreement between the parties that the stock could not be sold until all three of them agreed to sell. By converting the stock he held in trust, appellant became liable for the market value of the converted stock at the time of the conversion. *Cheesman v. Sathre, ante* p. 193, 273 P. (2d) 500, and cases cited therein.

In summary, we hold that the trial court was in error in holding that the release given by Folsom to appellant in settlement of his claim was invalid and did not bar his right to recover a judgment against appellant. As to Rogich's cause of action against appellant, we hold that it was properly established by the evidence and that the trial court was warranted in entering judgment in his favor.

Consequently, the judgment in favor of respondent Folsom against appellant must be, and hereby is, reversed, with directions to dismiss Folsom's cause of action.

Since we find no reversible error in the proceedings in the trial court as to Rogich's cause of action against appellant, the judgment entered by the trial court in favor of Rogich against appellant is hereby affirmed.

GRADY, C. J., SCHWELLENBACH, HILL, and WEAVER, JJ., concur.

'Reported in 278 P. (2d) 375.