[No. 4872–II. Division Two. January 14, 1982.]

JOHN CAREY O'STEEN, ET AL, *Respondents,* v. THE
ESTATE OF WILLIAM J. WINEBERG, *Appellant.*

*R. DeWitt Jones* (*Susan P. Graber* and *Stoel, Rives, Boley, Fraser & Wyse,* of counsel), for appellant.

*C. Duane Lansverk* and *Landerholm, Memovich & Lansverk,* for respondents.

PEARSON, J.—The Estate of William Wineberg (defendant) appeals a jury verdict in Clark County Superior Court awarding plaintiffs John and Lillian O'Steen the value of 20,000 shares in a petroleum corporation. Defendant raises the following issues on appeal:

1. Whether plaintiffs' claim, based on an oral agreement allegedly made in 1959, is barred by the 3–year statute of

limitations in RCW 4.16.080;

2. Whether an action against a trustee is barred by the nonclaim statute, RCW 11.40.010, when the trust property is inventoried as community property in the estate of the trustee's spouse and the beneficiary makes no claim in the estate;

3. Whether testimony of plaintiffs' witnesses was properly admitted by the trial court; and

4. Whether there was sufficient evidence to permit a jury to find (a) an enforceable contract for William Wineberg to buy and hold Lalta Petroleums, Ltd., stock for Johnny O'Steen, or (b) the payment of consideration by O'Steen.

We find no error by the trial court in respect of any of these issues and accordingly we affirm the verdict.

Plaintiffs' theory is that William Wineberg held some valuable shares as trustee of an oral trust under which plaintiffs were beneficiaries. Johnny O'Steen claimed that in 1958 William Wineberg had $25,000 of O'Steen's money; rather than repay this money, Wineberg agreed to let O'Steen have a 10 percent share of a petroleum corporation, Lalta Petroleums, Ltd., which Wineberg was forming. The 10 percent of Lalta, which amounted to 20,000 shares, was never transferred to plaintiffs, nor did plaintiffs make any demand for the shares from Wineberg during his lifetime. But after Wineberg's death in 1975, plaintiffs filed a claim in his estate for the value of the 20,000 shares, which by that time were worth over half a million dollars. That claim was rejected by Wineberg's personal representative and this litigation followed. Plaintiffs faced a difficult evidentiary problem in the trial, for nowhere was the alleged agreement by Wineberg recorded. There was no memorandum of the transaction in Wineberg's records or in the records of Lalta Petroleums, Ltd. Plaintiffs could produce no documentary evidence of the agreement from their own records. Their case, therefore, was based on the testimony of various people as to their recollections of events which took place over 20 years before the trial. Nevertheless, most of the facts of the case, with the critical exception of the existence of the

"trust agreement," are essentially undisputed. We turn now to set forth these facts before considering the evidence of the alleged agreement.

Lalta Petroleums, Ltd., was formed by three promoters: Paul Roston and Elmer Herbaly (petroleum engineers from Texas) and Eddie Bunting (an investor and promoter from California). In 1958 they met in Calgary, Alberta, with representatives from Canadian Pacific Railways and negotiated a lease of mineral rights to 8,000 acres of land from the railroad in an arrangement known as a "farm out." The three promoters paid equal shares of the $8,000 lease. The lease required that a minimum of three wells be drilled and that drilling on the first well begin within 90 days. The promoters received an estimate that the three wells would cost $250,000, considerably more money than they could raise among themselves. But this was not their only problem. They learned that the Canadian government would not approve farm out agreements with individual United States citizens; consequently a Canadian corporation was formed in December 1958. The corporation, Lalta Petroleums, Ltd., issued 200,000 shares of authorized stock, which were purchased by the three promoters for a penny a share.

The promoters, with 3 months to raise a quarter of a million dollars, began their search for investors to provide drilling capital. Early in 1959, Bunting contacted another California oil driller, Vern Parker, who suggested that the three men talk to William Wineberg, an investor who had put money into one of Parker's wells in 1957. Parker took the three men to the Bahia Hotel, Ensenada, Mexico, where Wineberg was vacationing. Among those in the Wineberg party at the Bahia Hotel was Johnny O'Steen, a friend and sometime business associate of Wineberg. Wineberg and O'Steen had been partners for a few months in 1958, as owners of the Westerner Casino in Nevada. The promoters stayed 5 days with Wineberg in Ensenada. They explained the project to him, and Wineberg agreed to take 50 percent of the deal. The promoters returned to California and con-

tinued their quest for investors for the remaining 50 percent. Time was running out for them, and with only 10 days left before the lease expired, they had found no one to provide the other half of the investment capital. Bunting informed Wineberg of the impasse, and Wineberg agreed to finance the whole project. The arrangements were quickly completed and drilling on the first well began within the 90–day time limit specified by the lease. The first well cost $50,000 and was financed by a loan from Wineberg and Associates. The second and third wells were also financed by Wineberg's investment group in the total amount of $130,000. Pursuant to the arrangements made to finance the drilling, in April or May of 1959 all 200,000 shares of Lalta were transferred to William Wineberg for the purpose of reissue. Shortly thereafter, the shares were redistributed to members of Wineberg's investment group in proportion to the amount of capital each had contributed. Promotional shares were issued to Parker, Bunting, Roston, and Herbaly. No shares were issued to Johnny O'Steen. William Wineberg retained 52,697 shares after these transactions were concluded. He subsequently acquired an additional 20,000 shares. On June 1, 1962, Wineberg's first wife, Janet, died. The 72,697 shares of Lalta stock held by William Wineberg were inventoried in Janet's estate as community property. Plaintiffs did not file a claim in Janet Wineberg's estate. They did, however, file a claim in William Wineberg's estate after he died on November 15, 1975. That claim was rejected by Wineberg's executor in June 1976, and the present suit followed.

Plaintiffs sought to establish that William Wineberg held proceeds from the sale of the Westerner Casino in 1958, and that an unspecified amount of these proceeds was O'Steen's share. O'Steen and Wineberg agreed orally that this money, held by Wineberg, would be put into the Lalta deal to obtain a 10 percent interest in Lalta, which Wineberg would hold in his own name but as trustee for plaintiffs. These contentions were based on the following testimony.

Under cross–examination, Mrs. O'Steen testified that her husband, Johnny, had a note which read, "John O'Steen owns ten percent of Lalta Corporation, also ten percent of the farmout. Signed Wm. J. Wineberg." She was familiar with William Wineberg's handwriting and signature and recognized the handwriting and signature on the note as Wineberg's. She first saw the note after Johnny returned from Canada to see the Lalta wells come in; he carried the note around with him for some time to show to his friends. Mrs. O'Steen lost the note in 1964 when she and Johnny had marital difficulties and she took all of their valuable papers.

Vern Parker, the oil driller who referred the promoters of Lalta to Wineberg, testified to a conversation which followed a card game in which both Wineberg and O'Steen played. Parker heard O'Steen say to Wineberg, "I will put twenty–five thousand of what you are holding . . . in the Lalta deal." Wineberg made no response. Some time later, O'Steen told Parker that he owned 10 percent of the Lalta deal. Parker did not testify as to anything Wineberg said about O'Steen's interest in the venture, and Parker did not see the note referred to by Mrs. O'Steen.

Eddie Bunting, one of the original promoters, testified by deposition that Wineberg had told him as they were leaving the Bahia Hotel in Ensenada in 1959 that "Johnny O'Steen is in for ten percent." In 1967, in a Long Beach restaurant, O'Steen showed Bunting a piece of paper signed by Wineberg. "It was just a short note that he was to receive his interest or stock certificates and his ten percent in the farmout." Bunting acknowledged that he "just glanced" at the paper O'Steen showed him.

In 1960 or 1961, Harold Pearson, a casino manager, met O'Steen in a Las Vegas bar. Wineberg was not present. Pearson testified by deposition that O'Steen showed him "a piece of paper that said 'Receipt from Wineberg for ten percent of _____ ' that company. I didn't even read it. I was sitting there having a few belts." Pearson testified that Wineberg's signature was on the paper and that it was

undated.

James Raley, William Wineberg's personal assistant, testified that Wineberg told him that a $42,000 check received by Wineberg was actually funds belonging to Johnny O'Steen and Vern Parker. This was the only testimony directly relating to the money allegedly owed to O'Steen by Wineberg. Raley did not tie the $42,000 check to the sale of the Westerner Casino. He did, however, testify that in July 1959, Wineberg paid O'Steen $15,000.

The jury was instructed on a single issue. "The issue for you to consider is whether William Wineberg and Johnny O'Steen, for consideration, entered into an oral agreement in 1959 whereby Wineberg was to purchase and hold for O'Steen's benefit ten percent of the stock in Lalta Petroleums, Ltd., a Canadian corporation." The jury's verdict was for plaintiffs.

Defendant argues in this appeal that plaintiffs' action is barred by the statute of limitations. Defendant argues that Wineberg had a "reasonable time" after entering into the contract in 1959 in which to buy stock on plaintiffs' behalf and then transfer it to plaintiffs. After that reasonable period of time, plaintiffs' cause of action accrued and the statute of limitations began to run. Because they waited 16 years to enforce the contract, plaintiffs' action was barred by the 3–year statute of limitations in RCW 4.16.080. Defendant also argues that an action in conversion or on a resulting trust theory to recover the shares would also be barred by RCW 4.16.080. We find it unnecessary to consider these contentions. It is clear that the case was decided on the basis that William Wineberg was trustee for plaintiffs of the Lalta stock. Therefore, the only consideration relative to this issue is whether plaintiffs' action as beneficiaries of the trust is barred by the statute of limitations.

This conclusion is compelled by the terms of the instruction to the jury. The instruction, which is not objected to by defendant, required the jury to consider whether there was an agreement by William Wineberg "to purchase and hold for O'Steen's benefit" the disputed shares. This lan-

guage, although it does not specifically include the word "trust," effectively put the issue of express trust before the jury. This follows from the reasoning and holding in a strikingly similar case, *Rogich v. Dressel,* 45 Wn.2d 829, 278 P.2d 367 (1954). In that case, plaintiffs were mine workers employed by the Pend Oreille Mines & Metals Company. In the course of their employment, they encountered some drill cores containing samples of rich ore which came from property owned by Metaline Metals. Plaintiffs decided that it would be profitable to invest in Metaline Metals, but they had no cash of their own with which to purchase shares. In July 1938, they approached defendant, who owned the local general store, to ask about borrowing money. Both plaintiffs had traded at defendant's store, one for 20 years, the other for 3 years. There was sharply conflicting testimony as to what occurred at the meeting at the store. Plaintiffs testified that they told defendant about the rich ore on the Metaline property and he responded that he had $800 which he would use to buy shares for the three of them. Defendant, on the other hand, testified that he made no such promise. Nevertheless, shortly after the meeting defendant did indeed purchase 10,000 Metaline shares at between 6 and 8 cents a share. Plaintiffs testified that they went to defendant's store in 1940 and offered to pay interest on the money invested in the shares, but that defendant declined their offer, saying, "A deal's a deal." Plaintiffs did not discuss the shares with defendant from 1943 until 1951, although both plaintiffs traded regularly at defendant's store. In 1945, Pend Oreille Mines merged with Metaline Metals and defendant surrendered his Metaline stock in exchange for Pend Oreille stock. Plaintiffs were aware that defendant had received at least one dividend after this stock transfer, but made no claim for a portion of the dividend. Finally, in 1951, plaintiffs asked for their shares and defendant refused, denying that any agreement had been made.

The Supreme Court upheld the trial court's finding that there was clear, cogent, and convincing evidence of an

agreement as alleged by plaintiffs.

> Therefore, we will accept as a fact the trial court's finding that an *express oral trust* in ten thousand shares of Metaline Metals stock was created in July, 1938, for the equal *benefit* of respondents and appellant, the stock to be *purchased* by appellant with his funds and to be *held* and sold only when the three parties should agree upon a sale.

(Italics ours.) *Rogich v. Dressel*, 45 Wn.2d at 840–41. The court held that the information conveyed by plaintiffs to defendant about the probable presence of valuable ore on the Metaline Metals property was a sufficient consideration to support the trust agreement. The court in *Rogich*, therefore, upheld the express oral trust where plaintiff established an express oral agreement, supported by consideration, to purchase shares and hold them for their benefit. There are at least four critical elements here: an agreement, consideration, a term in the agreement that one party will purchase and hold property, and a term that the property is held for the benefit of the claimant. All four of these elements were set out in the instruction given to the jury in the present case. Thus, although the instruction did not use the word "trust," it put squarely before the jury the issue of the existence of an express oral trust, as that concept is defined in *Rogich*. There can be no question, therefore, that this case was decided on the trust theory.

■ That being so, we turn now to consider whether the statute of limitations barred plaintiffs' action. An express trust is not subject to the statute of limitations until it is terminated or repudiated by the trustee. *Rogich v. Dressel*, 45 Wn.2d at 841. Defendant argues that the trust was repudiated by Wineberg, and that the repudiation had been communicated to plaintiffs by 1967 at the latest. The statute of limitations would therefore bar the action, which was not brought until 1976. Defendant claims that William Wineberg's repudiation of the trust is established by four facts:

1. William Wineberg took the shares in his own name

when he purchased them in 1959.

2. Wineberg inventoried the shares as community property in his wife's estate after her death in 1962.

3. Mrs. O'Steen testified that she did not want Wineberg to know that the note he had signed had been lost, because she believed in 1964 that, in the absence of the note, Wineberg would not honor his agreement.

4. The plaintiffs knew by 1967 that the other investors had received their stock from Wineberg in 1959.

■ The statute of limitations issue raises questions of both law and fact. The definition of repudiation and what facts may be sufficient to establish repudiation are of course matters of law. For example, the court in *Rogich* held, as a matter of law, that the exchange of shares following the merger and the receipt of dividends by the trustee did not constitute repudiation. Similarly, in the present case we conclude that the facts presented by defendant are not sufficient to constitute repudiation of the trust allegedly created in 1959.

■ A trustee may repudiate by words or other conduct by which he denies that there is a trust and claims the trust property as his own. G. Bogert, *Trusts and Trustees* § 951 (2d ed. 1962). The authorities are generally well agreed that a trustee's repudiation of an express trust must be plain, strong, and unequivocal to be sufficient to set the statute of limitations in motion against a beneficiary. It must be an open repudiation, and to be effective must be brought home to the beneficiary. Annot., 54 A.L.R.2d 13, 23 (1957). *Accord, Rogich v. Dressel, supra; Meck v. Behrens,* 141 Wash. 676, 252 P. 91, 50 A.L.R. 207 (1927); *Garvey v. Garvey,* 52 Wash. 516, 101 P. 45 (1909).

■ The fact that Wineberg took the shares in his own name when he purchased them in 1959 is not evidence of repudiation. A fundamental characteristic of a trust is that legal and equitable ownership of the trust property is divided between two parties; the trustee has bare legal title and the beneficiary has the equitable or beneficial ownership. 76 Am. Jur. 2d *Trusts* § 2 (1975). The fact that the

shares were in Wineberg's name indicates nothing more than that he was the legal owner of the shares; it is not inconsistent with the conclusion that he held the shares for the benefit of someone else. *Rogich v. Dressel, supra.*

Neither do we agree with defendant that Wineberg repudiated the trust by inventorying all his Lalta stock as community property in his wife's estate after her death in 1962. The purpose of the inventory required by RCW 11.44.015 is merely to furnish a list of property which appears to belong to the decedent. *Mezere v. Flory,* 26 Wn.2d 274, 279, 173 P.2d 776 (1946). The inventory is not conclusive as to the decedent's ownership of that property. *In re Estate of Belt,* 29 Wash. 535, 539–40, 70 P. 74 (1902). Therefore, although the inventory might suggest that Wineberg considered the shares to be his own, it is by no means conclusive. It certainly does not rise to the level of the plain, strong, and unequivocal repudiation necessary to start the statute of limitations running.

Defendant next argues that a repudiation was established by the testimony of Mrs. O'Steen that she and her husband deliberately refrained from telling Wineberg that the note evidencing the 1959 agreement had been lost. Mrs. O'Steen's testimony suggests that she believed that if Wineberg knew the note was lost he would disavow the trust. However, repudiation must be by words or conduct of the trustee; in the absence of sufficiently plain, strong, or unequivocal conduct by the trustee there can be no repudiation, whatever the beneficiary's belief or understanding.

Finally, defendant suggests that plaintiffs' knowledge that by 1967 all the other investors had received their promised stock somehow constitutes repudiation. It is difficult to see how the transfer of shares to other investors could constitute a plain, strong, and unequivocal disavowal of the trust for the benefit of plaintiffs.

For these reasons, we find that there is no evidence that the trust was repudiated and that the action was therefore not barred by the statute of limitations. Even had defendant presented evidence which might establish repu-

diation, there is a second reason this argument cannot prevail on appeal. Defendant requested no instructions which would have put the factual aspects of the repudiation issue before the jury. Failure to request appropriate instructions is fatal to assertion of the issue on appeal. *Haslund v. Seattle,* 86 Wn.2d 607, 621, 547 P.2d 1221, 1230 (1976).

The second issue raised by defendant is whether plaintiffs' claim is barred by the nonclaim statute, RCW 11.40-.010. This statute provides that any claims against a deceased's estate must be filed within 4 months of the first publication of notice by the personal representative of the deceased. All the Lalta shares owned by William Wineberg were inventoried as community property in the estate of his wife, Janet, after her death in 1962. Plaintiffs filed no claim in Janet Wineberg's estate. Defendant argues that RCW 11.40.010 bars the present action.

■ We hold that failure to claim in Janet Wineberg's estate does not bar this action. RCW 11.40.010 applies only where the claim is a general charge against the assets of the estate. It does not apply where the claim is for specific property in the estate. *Compton v. Westerman,* 150 Wash. 391, 273 P. 524 (1928). *See also Baird v. Knutzen,* 49 Wn.2d 308, 301 P.2d 375 (1956). Here the claim was for a specific percentage of stock in a corporation that William Wineberg held for plaintiffs as a trustee. Furthermore, since the stock was held by William Wineberg as a trustee, his marital community acquired no interest in it. *Leslie v. Midgate Center, Inc.,* 72 Wn.2d 977, 436 P.2d 201 (1967). The nonclaim statute does not apply.

The third ground on which defendant challenges the decision below is the admissibility of certain testimony. First, defendant argues that the deadman's statute, RCW 5.60.030, barred Mrs. O'Steen's testimony relating to the note signed by Wineberg. Mrs. O'Steen testified on direct examination to having seen the note, to recognizing Wineberg's signature on it, and to losing the note in 1964. On cross–examination, she testified as to the contents of the note.

RCW 5.60.030 states in part:

> [I]n an action . . . where the adverse party sues or defends . . . as deriving right or title by, through or from any deceased person . . . then a party in interest or to the record, shall not be admitted to testify in his or her own behalf as to any transaction had by him or her with, or any statement made to him or her, or in his or her presence, by any such deceased . . .

 ██ Mrs. O'Steen is a party to the record in the present case. The test of "transactions with a deceased" is whether the dead man, if living, could contradict the witness. *Diel v. Beekman,* 7 Wn. App. 139, 152, 499 P.2d 37 (1972). The general rule, however, does not apply here. Testimony of the loss of a writing is not evidence of a transaction with the deceased. *In re Estate of Bushnell,* 107 Wash. 331, 335, 182 P. 89 (1919). And the identification of a signature upon a writing is not a transaction with the deceased. *Goldsworthy v. Oliver,* 93 Wash. 67, 69, 160 P. 4 (1916). Mrs. O'Steen was therefore competent to testify as to these matters, and her testimony on direct examination was limited to these matters. It was not until cross–examination that she was asked to testify as to the contents of the note. Cross–examination of a witness on a matter protected by the deadman's statute constitutes a waiver of that protection. *McGugart v. Brumback,* 77 Wn.2d 441, 445, 463 P.2d 140 (1969). Defendant cannot object on appeal to the admission of testimony elicited from plaintiffs' witness under cross–examination. The deadman's statute is therefore not a bar to the admission of Mrs. O'Steen's testimony.

 Nor does the statute bar the testimony of Pearson and Bunting. These men testified that O'Steen showed them a note signed by William Wineberg stating that O'Steen had a 10 percent interest in Lalta. Defendant argues that this testimony related to a transaction with Wineberg and is, therefore, barred by RCW 5.60.030. The deadman's statute bars only the testimony of parties to the record or parties in interest. Neither Pearson nor Bunting was a party to the record. The test for a party in interest is

whether he will gain or lose from the judgment. *Diel v. Beekman, supra.* Neither Pearson nor Bunting stood to gain or lose anything from this litigation. Their testimony, therefore, is not barred.

The testimony of Pearson and Bunting identifying Wineberg's signature is challenged on the ground that no proper foundation was laid by showing that the witnesses were familiar with Wineberg's signature. This was not raised as an objection before the trial court and cannot be raised on appeal. *State v. Wicke,* 91 Wn.2d 638, 642–43, 591 P.2d 452 (1979). If any part of the testimony of these witnesses were inadmissible it would be testimony about the self–serving statements by O'Steen about the note and his interest in Lalta. *McFarland v. Department of Labor & Indus.,* 188 Wash. 357, 363, 62 P.2d 714 (1936). However, this was not raised before the trial court by specific objection and cannot be considered on appeal.

■ Defendant's final argument is that there was insufficient evidence to support a finding that the terms of the agreement between O'Steen and Wineberg were that Wineberg would "purchase and hold" the Lalta stock, and that consideration passed from O'Steen to Wineberg. Plaintiffs must establish the existence of the trust by clear, cogent, and convincing evidence. *Rogich v. Dressel,* 45 Wn.2d at 839–40.

The reviewing court may not substitute its judgment for that of the jury so long as there is evidence which, if believed, would support the verdict rendered. *State v. O'Connell,* 83 Wn.2d 797, 839, 523 P.2d 872, 77 A.L.R.3d 874 (1974). Inferences to be drawn from the evidence are within the province of the jury. *Id.* After reviewing the record presented on appeal, we conclude that there was evidence that a trust had been established to support the verdict, and that the jury could have found this evidence clear, cogent, and convincing.

Plaintiffs produced evidence that Johnny O'Steen had a note, signed by William Wineberg, which acknowledged that O'Steen owned 10 percent of Lalta Petroleums, Ltd. If

believed, this evidence supports the inference that Wineberg had purchased and was holding the shares for O'Steen. Indeed, no other explanation for Wineberg's executing the note readily presents itself.

As for evidence of consideration, James Raley testified that Wineberg told him that a $42,000 check actually represented funds belonging to O'Steen and Vern Parker. Parker testified as to O'Steen's statement in Wineberg's presence: "I will put $25,000 of what you are holding into the Lalta deal." This evidence supports the inference that Wineberg received consideration for the purchase of the shares. The only testimony tending to rebut this is Raley's statement that O'Steen received a $15,000 check from Wineberg. However, this testimony does not unequivocally lead to the conclusion that this was repayment in full for what Wineberg owed O'Steen. There was no notation of any kind on the check, and no testimony whatever explaining the circumstances in which it was transferred. We conclude therefore that there was sufficient evidence to support the jury's verdict.

Since we find no error in the proceedings in the trial court, the judgment entered in the trial court in favor of the plaintiffs is affirmed.

PETRIE, A.C.J., and PETRICH, J., concur.

Reconsideration denied February 9, 1982.

Review denied by Supreme Court May 7, 1982.